IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.                                                            CRIMINAL ACTION NO. 2:19-cr-00058

JALEN CHAPMAN

MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion to Suppress Evidence filed by Defendant Jalen Chapman. [ECF No. 21]. On February 24, 2020, the court held a pre-trial motions hearing on the matter and ordered additional briefing. [ECF No 57]. Defendant and the Government have filed supplemental memorandums. [ECF Nos. 64, 69]. The matter is now ripe for adjudication. The Motion is **DENIED** for the reasons that follow.

I.    Background

On September 29, 2018, Mr. Chapman had an active warrant for his arrest. On the same day, Mr. Chapman's girlfriend, Allison Harris, reported to the Charleston Police Department that Mr. Chapman was staying at her residence on Barber Drive. At approximately 10 or 11 pm, on the evening of September 29, 2018, Ms. Harris met with police officers at her mother's residence. The purpose of the meeting was to discuss how to execute the warrant for Mr. Chapman's arrest. Ms.

Harris gave officers a key to her residence on Barber Drive and permission to enter her home for the limited purpose of arresting Mr. Chapman. Both Ms. Harris and the officers expressed significant concern about the presence of Ms. Harris's four-year-old daughter in the home. At no time during that meeting did any law enforcement officer ask Ms. Harris for consent to search the home.

After the meeting with Ms. Harris, officers went to the Barber Drive residence to execute the arrest warrant. Officers apprehended Defendant Chapman and arrested him pursuant to the valid arrest warrant. Approximately five minutes later, Ms. Harris arrived at the Barber Drive residence. Ms. Harris's daughter was present in the house when the arrest warrant was executed. When Ms. Harris arrived at the home the child was in a back room with several officers. Upon arrival, Ms. Harris walked into the kitchen to find police opening and looking through cabinets. The officers made comments to her about drug paraphernalia that they had seen on the kitchen counters. Police then asked Ms. Harris if they could search the house. And she responded "yes," giving them permission to search. The initial meeting between police and Ms. Harris at her mother's residence, the arrest of Mr. Chapman, and the interactions between police and Ms. Harris when she arrived at the Barber Drive residence were all recorded by police body camera footage.

After obtaining permission to search from Ms. Harris, the police uncovered and seized a quantity of methamphetamine, a quantity of cocaine base, and two firearms. Mr. Chapman moves to suppress all evidence obtained from the search of the

residence on the ground that the search was conducted without a warrant and without a knowing and voluntary consent.

## II. Legal Standard

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). During the hearing, "the credibility of the witness[es] and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely,* 6 F.3d 1447, 1452–53 (10th Cir. 1993); *see also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 623 (1993)). The burden of proof is on the party who seeks to suppress the evidence. *United States v. Dickerson,* 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974).

## III. Discussion

The Fourth Amendment "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Consent to search is an exception to the warrant requirement. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Consent is valid if it is (1) knowing and voluntary, and (2) given by someone with the authority to consent. *Id.* Consent to search may be given by a third-party who has "common authority over or other sufficient relationship to" the effects or place to be searched. *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (*citing Matlock*, 415 U.S. at 171). As a co-tenant of the residence, it is undisputed that Ms. Harris had authority to consent to a search of the property. It is also evident by the video recordings and her own testimony that she gave consent to search. The only issue presented to the court is whether her consent was knowing and voluntary.

Determining whether consent to search was voluntary—as opposed to a product of duress or coercion—is a fact-based inquiry, evaluated under the totality of the circumstances. *Id.*; *see also Azua-Rinconada*, 914 F.3d at 325. In *Lattimore*, the Fourth Circuit provided several factors to consider in viewing the totality of the circumstances. *Lattimore*, 87 F.3d at 650. Those factors include characteristics of the accused, such as "age, maturity, education, intelligence, and experience," as well as the conditions under which the consent to search was given such as, "the officer's

4

conduct; the number of officers present; and the duration, location, and time of the encounter." *Id.*

Whether the person understood that she or he had the right to refuse to consent to the search is a "highly relevant factor." *United States v. Gomez-Zunun*, 751 F. App'x 374, 377 (4th Cir. 2018). But "this factor is not 'a necessary prerequisite to demonstrating a 'voluntary' consent.'" *Lattimore*, 87 F.3d at 650 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973)).

After considering the video evidence of Ms. Harris's interactions with the police and the testimony at the pretrial motions hearing, I find that Ms. Harris's consent for police to search her residence was knowing and voluntary.

There is no indication that the personal characteristics of Ms. Harris would prevent her from providing knowing and voluntary consent. She is a fully competent adult. There is no evidence that would call into question her education, maturity, or intelligence. Therefore, I will focus on the conditions under which Ms. Harris gave consent in determining whether it was voluntary.

On the video recordings, I observed a competent fully aware adult, displaying no outward signs of anxiety, give permission without reservation to police to search her home. The test for whether consent is voluntary is not objective. Instead, the question of voluntariness turns on the mental state of the person giving consent. Ms. Harris's state of mind was evidenced, in part, by the fact that she called the police to request that they execute the arrest warrant. She gave them a key to her home so that they could enter to execute the arrest warrant. Although her invitation into her

5

home extends consent only to executing the arrest warrant and does not sanction a search, this action provides context. The interactions between Ms. Harris and law enforcement were cooperative from their initial meeting onward.

There are inconsistencies between Ms. Harris's testimony at the suppression hearing, at the grand jury proceeding, and her demeanor in the video recordings of her interactions with police. Her behavior and statements in the video recordings do not comport with those of a person being coerced, intimated, or pressured into giving consent to search. On the video recording, she repeatedly gave consent, responding casually to the officers' request to search: "Yeah. I just said yeah," "do your thing, yeah." At the grand jury, Ms. Harris testified that the Charleston Police Department did not threaten or coerce her to give consent to search her home. She then testified at the suppression hearing, however, that she felt pressured by the large number (eight to ten) of male officers in her home. She further testified that she felt as though she could not say no to the officers' requests. These statements conflict with her testimony at the grand jury and her very apparent calm and cooperative attitude that I observed in the video recording.

Defendant invites this court to consider *United States v. Frank Boatrite*, 165 F. Supp. 3d. 484 (N.D.W.V. 2016). While of course not binding on this court, I also find that the facts of that case are distinguishable from those presented here. The case in *Boatrite* involved similar circumstances of a defendant's girlfriend giving consent for police to search the residence that she jointly occupied with the defendant. *Id.* at 486. The court in that case found that the girlfriend's consent was not voluntary.

*Id.* at 491. But in that case, the girlfriend told the officers she was "uncomfortable giving consent." *Id.* at 488. She then refused officers' requests to search "multiple times" and consented only after officers told her that "they would detain her outside the trailer until they obtained and executed a search warrant." *Id.* The facts of this case are starkly different. Ms. Harris never told police she was uncomfortable with them searching her home, to the contrary she gave them permission multiple times.

At the hearing on Defendant's Motion to Suppress, there was some discussion of officers hinting that they would arrest Ms. Harris for harboring a fugitive or alert Child Protective Services that there was a fugitive in the home with a child. These suggestions, however, took place at the initial meeting between police and Ms. Harris at her mother's residence. The comments were not made in connection with asking for consent to search. And judging from the testimony of Officer Casto and from the video recording of the conversation, the comments did not imply a serious intention to arrest Ms. Harris.

The fact that officers began a search prior to Ms. Harris's arrival to the residence does trouble me. It is undisputed and one can plainly see from the video recordings that officers were riffling through closed cabinets in the kitchen before Ms. Harris gave consent. That part of the search was conducted without a warrant and without consent. Although the items Defendant seeks to suppress were not seized during that part of the search, the fact that the police had already started the search when consent was given is relevant to the voluntariness of the consent. The officers here did not demonstrate model police practices. Nevertheless, whether police acted

7

ideally is not the issue. I conclude that the fact that police had already begun opening cabinets does not poison the voluntariness of Ms. Harris's consent. I largely draw this conclusion based on Ms. Harris's demeanor in the video recording and my determinations about the credibility of her testimony.

## IV. Conclusion

Accordingly, the court **DENIES** Defendant's Motion to Suppress. [ECF No. 21]. The court **DIRECTS** the Clerk to send a copy of this Order to Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: March 3, 2020

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE